719 P.2d 1185

Norman GARDNER, Chairman of the Idaho Commission For the Blind, both individually and in his official capacity representing himself and representing the Idaho Commission for the Blind, whose home address is 8265 Valley View Drive, Boise, Idaho 83704; Idaho Commission For the Blind, 341 West Washington, Boise, Idaho 83702; Ramona Walhof, individually and in her capacity as Director of the Idaho Commission for the Blind, 341 West Washington, Boise, Idaho 83702; John A. Cheadle, individually and in his capacity as Deputy Director of the Idaho Commission for the Blind, 6018 Bay, Boise, Idaho 83704, Plaintiffs-Appellants,

v.

John V. EVANS, Governor of the State of Idaho, individually, and in his capacity as the Chief Executive of the State of Idaho; Marty Peterson, Director of the Division of Financial Management, Office of the Governor, individually and in his capacity as Director of the Division of Financial Management; Lawrence W. Barnes, individually, and in his capacity as a member of the Board of the Idaho Commission for the Blind, 5120 Sorrento Drive, Boise, Idaho 83704; Jack Ugaki, individually, and in his capacity as a member of the Board of the Idaho Commission for the Blind, 265 Cascade, Idaho Falls, Idaho, 83401; and Howard H. Barton, individually, 2605 Utter, Boise, Idaho 83706, Defendants-Respondents.

No. 15921.

Supreme Court of Idaho.

May 22, 1986.

926

Marc Maurer (argued), Baltimore, Md., Frederic S. LeClercq, Knoxville, Tenn., and Kenneth L. Mallea, of the firm Mallea & Scrivner, Boise, for plaintiffs-appellants.

Michael T. Spink (argued) and Stanley W. Welsh, of the firm Clemons, Cosho & Humphrey, Boise, for defendants-respondents Barnes, Ugaki, and Humphrey.

Patrick D. Costello, Office of the Governor, Boise, for defendants-respondents Governor Evans and Peterson.

BISTLINE, Justice.

Ramona Walhof was director of the Idaho Commission for the Blind when she was terminated by a 2–1 vote of that Commission. The members of the Commission at the time of Walhof's firing were Dr. Norman Gardner, Commission Chairman and a co-plaintiff in this suit, Lawrence Barnes, and Jack Ugaki, two of several defendants in this suit.

The plaintiffs—Gardner, Walhof, and John Cheadle, a deputy director of the Idaho Commission for the Blind at the time of his firing—allege that Ugaki and Barnes decided to fire Walhof in a manner violative of Idaho's Open Meetings Law, I.C. § 67–2340 et seq. This action, they argue, should be held null and void pursuant to I.C. § 67–2347.

The plaintiffs also allege that Ugaki and Barnes then agreed to hire Howard Barton—another defendant in this case—to replace Walhof. After Barton was hired, he fired Cheadle. The plaintiffs argue that because Barton's hiring was illegal, anything he did while in the capacity of Administrative Director is also null and void.

The plaintiffs subsequently amended their complaint, naming as additional defendants Governor John Evans and Marty Peterson, Director of Idaho's Division of Financial Management, and alleging constitutional violations. They claim that Walhoff and Cheadle were dismissed, and Gardner excluded from meetings by Ugaki and Barnes, because of the plaintiffs' affiliation with the National Federation of the Blind. This, they claim, violated their First Amendment rights of freedom of association.

The plaintiffs also allege that the defendants fired Walhof and Cheadle and excluded Gardner because Walhof and Cheadle publically criticized a proposal by Governor Evans to consolidate the Idaho Commission for the Blind with the state's Department of Health and Human Services. Thus, plaintiffs also argue that their First Amendment rights of freedom of speech have been violated.

The plaintiffs argue that each of the above acts occurred while defendants were acting within the course and scope of their employment as state officials. They argue, therefore, that they are entitled to relief for these alleged constitutional violations pursuant to 42 U.S.C. §§ 1983 and 1985. In their amended complaint, plaintiffs also alleged due process violations. On appeal, plaintiffs also argue that their complaint sufficiently supports claims for violation of

§ 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp.1984), and for defamation.

The district court, in two separate decisions, granted defendants' motion for summary judgment. The district court held that no genuine issues of fact exist concerning any of plaintiffs' claims, and held, as a matter of law, that defendants were entitled to judgment. Plaintiffs now appeal to this Court.

The plaintiffs raise the following six issues on appeal: (1) Did the district court err in ruling against plaintiffs on their claims of violations of Idaho's Open Meetings Law? (2) Did the district court err in ruling against plaintiffs on their claims of violations of freedom of speech? (3) Did the district court err in ruling against plaintiffs on their claims of violations of freedom of association? (4) Did the district court err by ruling against plaintiffs on their claims of violations of procedural due process? (5) Have plaintiffs adequately made out claims of violations of § 504 of the Rehabilitation Act of 1973? (6) Have plaintiffs adequately alleged a defamation claim?

## I. STANDARD OF REVIEW

Before addressing these issues, we note the standards upon which summary judgments are to be granted and reviewed on appeal. It is axiomatic that a motion for summary judgment should only be granted when all of the facts contained in all the applicable pleadings, depositions, admissions, and affidavits have been construed most favorably to the nonmoving party, and it is clear that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Bailey v. Ness*, 109 Idaho 495, 497, 708 P.2d 900, 902 (1985); I.R.C.P. 56(c). Furthermore, the nonmoving party is to be given the benefit of all favorable inferences which might reasonably be drawn from the evidence. *Doe v. Durtschi*, 110 Idaho 466, 716 P.2d 1238 (1986); *Reis v. Cox*, 104 Idaho 434, 438, 660 P.2d 46, 50 (1983). Motions for summary judgment should be

granted with caution. *Bailey, supra,* at 497, 708 P.2d at 902; *Steele v. Nagel*, 89 Idaho 522, 528, 406 P.2d 805, 808 (1965). Finally, when the motion is supported by depositions or affidavits, the adverse party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." I.R.C.P. 56(e). The latter requirement, however, does not change the standard of favorable construction, mentioned above, which is applicable to summary judgment motions. *Durtschi, supra,* 110 Idaho at 469, 716 P.2d at 1241; *Central Idaho Agency, Inc. v. Turner*, 92 Idaho 306, 310, 442 P.2d 442, 446 (1968). With those standards in mind, we turn to the issues.

## II. THE DISTRICT COURT ERRED IN RULING AGAINST THE PLAINTIFFS ON THEIR CLAIMS OF VIOLATIONS OF IDAHO'S OPEN MEETINGS LAW

### A. *Idaho's Open Meetings Law.*

In 1974, the legislature declared that "the formation of public policy is public business and shall not be conducted in secret." 1974 Idaho Sess.Laws, ch. 187, § 1, p. 1492, codified at I.C. § 67–2340. In order to implement this mandate, the legislature has declared that "[a]ll meetings of a governing body of a public agency shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by this act." I.C. § 67–2342(1).

An exception to the requirements of I.C. § 67–2342(1) "otherwise provided by this act" is made for meetings classified as "executive sessions." I.C. § 67–2341(2) defines "executive sessions" as "any meeting ... of a governing body which is closed to any persons for deliberation on certain matters." Such sessions are authorized for several types of matters, including when a governing body wishes to deliberate the dismissal of a public employee working un-

der the supervision of that body. I.C. § 67-2345(1)(b). No executive session may be held, however, "for the purpose of taking any final action or making any final decision." I.C. § 67-2345(3). Where only an executive session is held, notice first must first be given "to the members of the governing body, and to the general public, stating the reason and the specific provision of law authorizing the executive session." I.C. § 67-2343. Finally, any action taken at any meeting in violation of Idaho's Open Meetings Act, shall be "null and void." I.C. § 67-2347.

B. *Applying Idaho's Open Meetings Law to the Facts of this Case.*

█ The Commission fired Walhof on February 3, 1984, during the course of a public meeting. Walhof contends that insufficient notice of this meeting was given by the Commission. We disagree. The record establishes that notice of the February 3, 1984 meeting was mailed out by *Walhof* and that she did in fact attend this meeting. R., Vol. 1, p. 24. Walhof cannot, therefore, argue prejudice as far as any allegation of improper notice is concerned, because it is clear that *she* was not disadvantaged by any notice deficiency.

Walhof next contends that a genuine issue of material fact exists with respect to *when* she was dismissed. Specifically, Walhof argues that viewing the facts most favorably on her behalf leads to the conclusion that she was fired in advance of the February 3, 1984 meeting, and that this was in violation of I.C. § 67-2340 and 67-2345(3). Accordingly, pursuant to I.C. § 67-2347, Walhof argues that her dismissal is null and void. Furthermore, Cheadle argues that Barton's appointment was premature and, thus, that his dismissal is also null and void.

The facts that Walhof and Cheadle argue create a genuine issue of fact about *when* she was fired and Barton hired, include the following:

1. Dr. Gardner testified that Barton, who was appointed by the Commission to replace Walhof, made an "acceptance"

speech before the Commission had even voted on whether to dismiss Walhof.

2. Dr. Gardner next testified that within a few minutes after the February 3, 1984 meeting was over, a locksmith was at the Commission's office changing locks.

3. A press release stating that Walhof had been dismissed was released to the press before the Commission had voted on her dismissal.

4. A letter of dismissal was given to Walhof a very short time after the February 3, 1984 meeting. According to Dr. Gardner, the letter had "legal-type wording," which Barton—the signatory to the letter—could not have written. Furthermore, Dr. Gardner testified, the letter to Walhof made "reference to things that the board had told her ostensibly during the meeting about her being dismissed which the board never told her during that meeting."

5. A similar letter was given to Cheadle, whom Barton dismissed upon being named Director of the Blind Commission.

A close review of each of these alleged facts show that they would be either irrelevant, inadmissible, or incompetent as evidence and therefore do not create any genuine issue of fact with respect to Walhof's and Cheadle's dismissal.

I.R.C.P. 56(e) requires that "supporting and opposing affidavits shall be made on personal knowledge, *shall set forth facts as would be admissible in evidence*, and shall show affirmatively that *the affiant is competent to testify* to the matters stated therein." (Emphasis added.) The matters referred to by Gardner, and upon which the plaintiffs rely, do not satisfy either the requirement of admissibility or competency under Rule 56(e). Most are opinions or conclusions of Gardner, which are not only inadmissible, but which are contrary to other admissible evidence in the record. Other evidence relied upon is irrelevant to the issue before us.

Taking the five items up in order, it is readily apparent that Gardner's testimony that Barton made an "acceptance" speech

before the Commission even voted on whether to dismiss Walhof is an inadmissible conclusion. It is also contrary to the uncontradicted evidence in the case.

As mentioned above, the February 3, 1984 meeting was properly noticed by Walhof herself, and started at 9:00 in the morning, with the Commission meeting in an executive session. The public portion of the meeting commenced sometime around 10:00. At the very start of the public portion, a motion was made by Commissioner Barnes "that we relieve Mrs. Walhof of her duties as administrator immediately and leave her on administrative pay for 45 days.... I'd like to appoint Howard Barton acting administrator for six months." The motion was seconded by Commissioner Ugaki. There then followed approximately two to three hours of heated discussion between two competing factions, with some fifteen or twenty people debating the pros and cons of the motion.

■ The meeting adjourned for lunch and reconvened sometime around 2:00 p.m. At that time Howard Barton spoke in an effort to reconcile the two factions supporting and opposing Barnes's motion. A transcript of the meeting shows that he commenced his remarks with the statement, "I think that in the future *if the board does make the decision to retain me as acting administrator for a short period of time* I will make every effort to work with all of the organizations of the blind in this state." (Emphasis added.) He then went on to state what steps he intended to take to try to accomplish that. Thus, it is clear that not only is Gardner's statement that Barton made an "acceptance" speech before the Commission voted an inadmissible opinion or conclusion of Gardner, it is contrary to the uncontradicted record in the case. Barton only spoke some two to three hours *after* the motion had been made and debated, and then he qualified his remarks with the comment, "if the board does make the decision to retain me." Accordingly, there is no merit to Gardner's first contention that the Commission must have met before and made a decision because Barton had made an "acceptance" speech before the Commission even voted on whether to dismiss Walhof.

■ Regarding the locksmith's presence, the testimony shows that the locksmith arrived several minutes after the meeting concluded. We do not see how this evidence is substantial and competent proof that Barnes and Ugaki met before the meeting and had an agreement to discharge Walhof. It therefore fails to create any genuine issue of material fact, and we so hold.

■ The plaintiffs' third contention—that a press release stating that Walhof had been dismissed was handed to the press before the Commission had voted on her dismissal—is irrelevant with respect to the issue before us. It is not shown that it was prepared by anyone connected with the Blind Commission or the defendants in this action. Rather, the record shows that the press release was prepared by a Brian Wardle, who was president of the Independent Blind of Idaho, and a supporter of the defendants' decision to fire Walhof. In two separate depositions, Wardle testified that he wrote the press release during the noon hour from notes he made while at the morning session as the various people testified. He also testified that he did hand a copy to a member of the press before the Commission's vote. The individual read it and said, "This hasn't happened yet," to which Wardle said, "You're right, I'll give it to you after the meeting, if it happens." Wardle then testified that the person "gave it back to me, and I handed it out to the press corps after that was over." Thus, it is clear from the record that the press release emanated from the Independent Blind of Idaho, and is not attributable to the Commission or the defendants. It falls short of being relevant to fixing the time when the decision was made to fire Walhof.

■ The next contention which Gardner made in his deposition is that the letter of dismissal given to Walhof a very short time after the meeting terminated had "legal type wording," which Gardner opined Bar-

ton was incapable of composing. Accordingly, it was his conclusion that it must have been drawn by a lawyer beforehand. This mere conjecture and opinion, without any foundation laid, would not be admissible evidence. Accordingly, under Rule 56(e) the trial court properly disregarded it, as must this Court.

The last contention is that a letter of dismissal given to Cheadle whom Barton dismissed after he took over also could not have been written by Barton. For the same reasons stated above, it is clear that this allegation is equally inadmissible as pure conjecture and a conclusion of the witness. Accordingly, we hold that the facts do not create a genuine issue of material fact. We therefore affirm the district court on this issue.

## III. THE DISTRICT COURT DID NOT ERR IN RULING AGAINST PLAINTIFFS ON THEIR CLAIMS OF VIOLATIONS OF FREEDOM OF SPEECH

### A. *Introduction.*

On this issue, Walhof alleges that Commissioners Ugaki and Barnes fired her because of criticism she leveled at Governor Evans' proposal to merge the presently independent Idaho Commission for the Blind with the Department of Health and Human Services. Walhof further alleges that the two commissioners decided to dismiss her because of pressure they received from Governor Evans and Martin Peterson. This, Walhof argues, violated her First Amendment rights of free speech.

Cheadle argues that Barton fired him because of a speech Cheadle delivered at the February 3, 1984 meeting wherein Cheadle vigorously defended Walhof's record. This, Cheadle argues, violated his First Amendment rights of free speech.

Based upon applicable law and the facts of this case, the arguments of both Walhof and Cheadle are not persuasive.

### B. *The Applicable Law.*

Neither Walhof nor Cheadle have alleged that the *Idaho* Constitution's provision for freedom of speech—art. 1, § 9—has been violated. "[B]ecause the wording of that section is different from that found in the First Amendment," *State v. Newman,* 108 Idaho 5, 15 n. 25, 696 P.2d 856, 866 n.25 (1985), we "decline to decide if the rules we apply today under the First Amendment are equally applicable under art. 1, § 9." *Id.* at 16 n. 25, 696 P.2d at 867 n. 25.[1] We therefore turn to case law under the First Amendment.

The most recent decision of the United States Supreme Court to address the First Amendment rights of public employees is *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Connick,* the plaintiff-employee, Sheila Myers, was an assistant district attorney. The defendant-district attorney, Harry Connick, proposed to transfer her and alter her duties. Myers objected strenuously and shortly thereafter prepared and distributed a questionnaire to other assistant district attorneys. The questionnaire asked the attorneys their feelings concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervising attorneys, and whether employees felt pressured to work in political campaigns. Connick then discharged Myers for refusing to accept the transfer, stating also that her questionnaire was considered to be an act of insubordination. Connick filed suit under 42 U.S.C. § 1983 (1976 ed., supp. IV), contending that her employment was wrongfully terminated because she had exercised her constitutionally protected right of free

---

**1.** Not before us, therefore, is the "task of determining if the First Amendment of the United States Constitution and art. 1, § 9 of the Idaho Constitution compel different analytical methodologies with outcomes necessarily different in some cases." *Id.* We do note, however, that "[p]referably, when addressing constitutional is-

sues, our state constitutional provisions should be reviewed first before turning to the federal constitution." *Nampa Christian Schools v. Department of Employment,* 110 Idaho 918, 936 n. 3, 719 P.2d 1178, 1196 n. 3 (Sup.Ct.1986) (citation omitted).

speech. *Connick, supra,* 461 U.S. at 141, 103 S.Ct. at 1686–87. A federal district court agreed with Myers, ordering her reinstatement, and awarding her damages, backpay, and attorney's fees. *See Myers v. Connick,* 507 F.Supp. 752 (E.D.La.1981). The Fifth Circuit Court of Appeals affirmed the district court. *See Myers v. Connick,* 654 F.2d 719 (1981). The United States Supreme Court reversed.

■ The Supreme Court began its analysis by noting that a state cannot establish conditions of public employment which infringe upon an employee's constitutional right of free speech. *Connick, supra,* 461 U.S. at 142, 103 S.Ct. at 1687; *see also Branti v. Finkel,* 445 U.S. 507, 515–16, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980). The Court noted, however, that First Amendment rights in this area are not absolute, and that a court in these circumstances must " 'balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Connick, supra,* 461 U.S. at 142, 103 S.Ct. at 1687, *quoting Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

■ The Court noted that, while speech on public issues is the quintessential First Amendment value, *Connick, supra,* 461 U.S. at 145, 103 S.Ct. at 1689, the First Amendment "does not require a public office to be run as a round table for employee complaints over internal office affairs." *Id.* at 149, 103 S.Ct. at 1691. Furthermore, government does have a legitimate interest in "effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150, 103 S.Ct. at 1692. The key, then, is in the *nature* of the employee's expression— whether it relates to matters involving "political, social, or other concern to the com-

munity," *id.* at 146, 103 S.Ct. at 1690, or to internal office affairs.

The Court stated that Myers' questionnaire, with one exception, could not qualify as a matter of "public concern." *Id.* at 148, 103 S.Ct. at 1690.[2] Overall, the Court viewed Myers' questionnaire as touching upon "matters of public concern in only a most limited sense...." *Id.* at 154, 103 S.Ct. at 1693–94. Accordingly, her First Amendment rights were viewed as being but "limited," *id.* at 154, 103 S.Ct. at 1694, and insufficient to overcome the government's interest in office management. *Id.* Accordingly, the Court ruled against Myers.

■ Although unmentioned in *Connick,* it is also the law that before the parties' competing interests are weighed in the balancing process discussed above, there is a burden upon the employee to show that the speech in issue was a "substantial" or "motivating factor" in the employee's discharge. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). We turn now to the question of whether Walhof met her burden, and then to whether Cheadle has made out a claim for violation of his rights of free speech.

C. *Walhof Has Failed Her Burden of Proving that the Comments She Made in Criticizing the Governor's Proposed Reorganization of the Blind Commission Were a Substantial Factor in Her Discharge.*

■ In depositions, Governor Evans, Barnes, Ugaki and Peterson stated that the Governor and his office never sought the dismissal of Walhof, and that the commissioners did not fire her because of her statements. In fact, both Ugaki and Barnes supported Walhof in her opposition to the Governor's proposed plans for the

---

**2.** The one exception was a question which asked whether any assistant district attorney had felt "pressured to work in political campaigns on behalf of office supported candidates." *Id.* at 149, 103 S.Ct. at 1691. This question, the Court stated, did touch on matters of public concern.

*Id.* Nevertheless, as discussed above, in balancing the competing interests of this case, Myers' First Amendment rights were not viewed to be as weighty as the government's interests in office management. *Id.* at 154, 103 S.Ct. at 1694.

**934**

Blind Commission. *See* R., Vol. 3, pp. 115 and 128. Peterson did relay to Barnes and Ugaki information that the Governor wanted an apology from Walhof for allegedly misrepresenting the Governor's position. Barnes stated, however, that the Governor's office only wanted an apology and that they in no way wanted to be part of any request for resignation or discharge. Barnes' Deposition, pp. 63–64, 86–87.

There is nothing in the record to suggest that the Governor's office ordered or was responsible for Walhof's discharge. Neither is there evidence that Commissioners Barnes and Ugaki fired her because of the comments she made which were critical of the Governor. Mere allegations do not suffice in the face of the defendants' depositions. I.R.C.P. 56(e). We find no factual dispute relative to Walhof's dismissal so far as it relates to any infringement of her free speech rights under the First Amendment.

We also note that Barnes voted to dismiss Walhof because she had offended too many people in her management of the Blind Commission and that too many talented people had quit their jobs within the Commission while Walhof had been director. Barnes' Deposition, pp. 43–53. Ugaki agreed with this assessment. *See* Ugaki's Deposition, pp. 58–59. These reasons, quite obviously, violate no constitutional rights and constitute a valid basis upon which the Commission could have acted.

This point is important, because in *Mt. Healthy, supra,* a unanimous Supreme Court declared that even if constitutionality protected conduct *was* a substantial factor in a discharge, the discharge would *not* be held invalid if the governing body can show by a preponderance of evidence that "it would have reached the same decision ... even in the absence of the protected conduct." *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576. That burden would be met here even if Walhof could prove that what she said was a substantial factor in her discharge. Accordingly, we reject Walhof's arguments on this issue.

**D.** *Cheadle Has Failed to Establish that His Free Speech Rights Were Violated.*

Cheadle's claim on this issue is against Barton, whom Commissioners Barnes and Ugaki appointed to replace Walhof. Cheadle's allegation is that a speech he made at the February 3, 1984 meeting was a substantial factor in his subsequent discharge. The speech Cheadle refers to was a speech of praise on behalf of Walhof and her accomplishments. Cheadle spoke strenuously for her continued employment and ended by stating that "If Mrs. Walhof goes I will go...." R., Vol. 4, p. 221.

In his deposition, Barton suggested that Cheadle's statement at the February 3, 1984 meeting was at least a substantial factor in his decision to dismiss Cheadle:

Q. Now, on Friday, the 3rd of February, you took action to dismiss Mr. Cheadle; is that correct?

A. That's correct.

Q. And what was the basis for that action?

A. Well, you would have had to have been in the meeting that took place, I guess, the 3rd, to understand some of the thinking behind that, but it seemed clear to me with respect to what Mr. Cheadle said during that meeting that he would be unwilling to cooperate with me, and I just felt that that's what I sensed at that point, and I felt it would be difficult to work with him. So he had said that he would resign, made that quite clear during the meeting. I think there were a number of other people made the same statement. I asked him following the meeting if that's what he fully intended to do and he told me that it was and he told me that he had gone to prepare a letter of resignation in his office. And I said, "If you are going to do that, well then let's get it done."

And then I think later in the afternoon he talked to Mrs. Walhof and then went back to his office and called me and told me no, he was not going to resign, that

he felt that he could stay there and do things for the agency. And I told him—well, my feeling at that point, you know, whether anybody wants to criticize it or not, was that I would dismiss you and I did. Barton Deposition, pp. 32–33.

With Barton's testimony, Cheadle has satisfied the *Mt. Healthy* burden of showing that the speech in issue was a substantial factor in his discharge. We turn, then, to the balancing test set forth in *Connick* to determine if his free speech rights have been violated.

Our review of the evidence convinces us that Cheadle's speech does not affect matters of "public concern." *Connick, supra,* 461 U.S. at 148, 103 S.Ct. at 1690. The speech is directed at whether Walhof should be dismissed—an office dispute—and is similar to the type of dispute that gave rise to the suit in *Connick.* The speech cannot be fairly viewed as involving matters of "public concern." So viewed, we feel compelled by the Supreme Court's holding in *Connick* to hold similarily here that Cheadle's free speech rights are not as weighty as the right of the government to govern. Accordingly, we reject Cheadle's free speech claim.

## IV. THE DISTRICT COURT DID NOT ERR IN RULING AGAINST THE PLAINTIFFS ON THEIR CLAIMS OF VIOLATIONS OF FREEDOM OF ASSOCIATION

The plaintiffs' contention on this issue is that Walhof and Cheadle were discharged because of their affiliation with the National Federation of the Blind. Gardner is also a member of this federation, and argues that he was excluded from consultations based upon his membership in the federation.

The right to associate for expressive purposes, although recognized under and protected by the First Amendment, is not absolute. *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984). When action potentially infringes upon this right, a balancing test must be used to weigh the competing interests. *Id.* We hold that the principles and balancing test we discussed in Part III, *supra,* relative to the plaintiffs' free speech claims, are equally applicable here. We similarly hold that the *Mt. Healthy* burden also applies here, requiring plaintiffs to show that their protected association rights were a substantial or motivating factor in their discharge. For the reasons stated below, we hold that they have failed to meet that burden.

The evidence shows that there was much "dissension," Ugaki Deposition, p. 14, within the blind community. Barnes stated in his deposition that two "factions" within the blind community were at "war" with each other. Barnes Deposition, p. 52. These two factions consisted primarily of members of the National Federation of the Blind and members of the Independent Blind of Idaho, of which Barton was a member. The evidence does not show, however, that Walhof and Cheadle were dismissed *because* of their membership in the National Federation of the Blind.

In over 36 pages of their brief, plaintiffs have attempted to demonstrate that they were discharged because of their membership in the National Federation of the Blind. None of the evidence relied upon, however, suggests a plan or decision to dismiss Walhof and Cheadle *because of* their particular membership. That animosity between the two groups existed is not disputed. The mere showing of animosity, however, cannot survive the instant motion for summary judgment, because that animosity has not been shown to be the *cause* of the dismissals.

We are cognizant of, and readily acknowledge, the right an individual enjoys under the First Amendment "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends." *Roberts, supra,* 104 S.Ct. at 3252. Government actions that unconstitutionally infringe upon this right include: (1) imposition of penalties or the withholding of benefits from individuals because of their membership in a disfavored

group, *Healy v. James,* 408 U.S. 169, 180–84, 92 S.Ct. 2338, 2345–47, 33 L.Ed.2d 266 (1972); (2) required disclosure of membership lists of a group seeking anonymity, *Brown v. Socialist Workers '74 Campaign Committee,* 459 U.S. 87, 91–92, 103 S.Ct. 416, 419–21, 74 L.Ed.2d 250 (1982); and (3) intentional interference with an internal organization's operations, *Cousins v. Wigoda,* 419 U.S. 477, 487–88, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975).[3] Plaintiffs have not shown how their rights have been violated in this instance. We therefore reject their claims on this issue.

## V. THE DISTRICT COURT DID NOT ERR IN RULING AGAINST PLAINTIFFS ON THEIR CLAIMS OF VIOLATIONS OF PROCEDURAL DUE PROCESS

Walhof and Cheadle argue that they were discharged without procedural due process.[4] They rely upon the case of *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), for support. We find *Loudermill* to be inapposite.

In *Loudermill,* an Ohio employee was discharged upon discovery that he had filled out a job application falsely. Ohio law labeled the employee's job position as "classified civil servant." *Id.* 105 S.Ct. at 1490. Under Ohio law, such employees can only be terminated for cause. *Id.* The issue the Supreme Court addressed, therefore, was what "pretermination process must be accorded a public employee who can be discharged only for cause." *Id.* at 1489. The Supreme Court held that federal procedural due process entitled the employee the opportunity to respond to the charges against him *prior to* his removal. *Id.* at 1494–96.

■ *Loudermill* is inapplicable, however, because it involved the constitutional rights of a "classified civil servant." *Id.* at 1490. In our case, both Walhof and Cheadle qualified as "exempt" employees. I.C. § 67–5303. "Exempt" employees in Idaho do not enjoy the statutory protection that "classified employees" enjoy, I.C. § 67–5302(4), and which are similar to the rights enjoyed by Ohio's classified civil servants.[5]

---

**3.** As the Supreme Court noted in *Roberts,* not only does an individual enjoy the right of "expressive association," *Roberts, supra,* 104 S.Ct. at 3250, which is grounded in the First Amendment, *id.* at 3249, he or she also enjoys a right of "intimate association." *Id.* at 3250.

This second right is grounded in principles of "personal liberty," *id.* at 3249, and applies to cases where relationships centering around family, marriage, and children are involved. *Id.* at 3250. The right of "intimate association," by its nature, is only applicable to relationships that are small, intimate, and private. *Id.*

Thus, the Supreme Court has held that the United States Jaycees organization does not possess the types of relationships that are "worthy of this kind of constitutional protection." *Id.* at 3251. This is because of the Jaycees' large size and lack of selectiveness. *Id.* These same reasons lead us to conclude that the plaintiffs, as part of the National Federation of the Blind, are not entitled to any constitutional protection of association so far as their claims are grounded in "personal liberty" principles.

**4.** As with their other constitutional challenges, plaintiffs did not allege any violation of due process under Idaho's Constitution.

**5.** I.C. § 67–5309(n) sets forth in detail the only grounds upon which a classified employee of the State of Idaho may be discharged. The

section is of similar scope to Ohio's law—Ohio Rev.Code Ann. § 124.34 (1984)—which the Supreme Court, in *Loudermill,* held was sufficient to grant the Ohio state employee a right to a pretermination hearing. Section 67–5309(n) states that the state Personnel Commission shall have authority to promulgate:

> (n) A rule for the discharge or reduction of rank or grade or disciplining of permanent employees only *for cause* with reasons given in writing. (Emphasis added.)

Subsection n then proceeds to list seventeen reasons which "shall be proper cause for discharge. . . ." These seventeen reasons include incompetency, insubordination, and other causes relating to job performance and personal honesty. Pursuant to § 67–5309(n), the Personnel Commission has enacted Rule 19.A.1, which incorporates that which is set forth in subsection (n).

I.C. § 67–5309A(2) supplements § 67–5309(n), stating that no "disciplinary dismissal, suspension or demotion . . . shall be effective until the affected employee shall have had the opportunity to complete the grievance procedure adopted pursuant to subsection (1) hereof. . . ." The Personnel Commission's corollary rule is Rule 20.A. This section, and the Commission's rule, thus grant a pretermination hearing, and would seem to satisfy the requirements of *Loudermill.*

It is clear, then, that the "property interests in continued employment that the employee in *Loudermill* enjoyed, and which classified employees in Idaho enjoy, are not enjoyed by exempt employees in Idaho.

 It is the rule that "[p]roperty interests are not created by the Constitution." *Loudermill, supra,* 105 S.Ct. at 1491. Rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Thus, the Supreme Court in *Connick* could state: "[O]rdinary dismissals from government service which violate no fixed tenure of applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." *Connick, supra,* 461 U.S. at 146–47, 103 S.Ct. at 1690.

There are no statutorily-created property interests to which Walhof and Cheadle can claim entitlement. There is also no other principle in our law that would grant the plaintiffs a property interest which would entitle them to due process protection.

 In *Harkness v. City of Burley,* 110 Idaho 355, 356–57, 715 P.2d 1285, 1286–87 (Sup.Ct. (1986), this Court analyzed the question of what would constitute a property interest in employment in Idaho. Said the Court:

> To have a property interest in employment in Idaho, the employee must have more than a mere hope of continued employment. *Loebeck v. Idaho State Board of Education,* 96 Idaho 459, 461, 530 P.2d 1149, 1151 (1975). Certainly a permanent employee, whose employment is not terminable at the will of either the employee or the employer, holds a property interest in his or her position. *Allen v. Lewis-Clark State College,* 105 Idaho 447, 460 n. 6, 670 P.2d 854, 867 n. 6 (1983) ("A term of employment set by contract is a property interest safeguard-

ed by due process."); *Bowler v. Board of Trustees,* 101 Idaho 537, 541, 617 P.2d 841, 845 (1980) (Teacher's interest in renewable contract rights to continued employment was a property interest.); *Ferguson v. Board of Trustees,* 98 Idaho 359, 364, 564 P.2d 971, 976 (1977), *cert. denied,* 434 U.S. 939 [98 S.Ct. 431, 54 L.Ed.2d 299] (Teacher's right to automatic annual renewal of contract and right not to be discharged except for cause gave property interest in employment.).

As Chief Justice Donaldson wrote for a unanimous Court, an employee "hired pursuant to a contract which specified the duration of the employment, *or* limits the reasons for which the employee may be discharged" is not an employee "at will."[6] *MacNeil v. Minidoka Memorial Hospital,* 108 Idaho 588, 589, 701 P.2d 208, 209 (1985) (emphasis added). The contract can be express or implied. *Clements v. Jungert,* 90 Idaho 143, 153, 408 P.2d 810, 815 (1965); *see Bishop,* [*v. Wood* ], *supra,* 426 U.S. [341] at 344 [96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) ]. An employee's handbook can constitute an element of the contract. *Johnson v. Allied Stores Corp.,* 106 Idaho 363, 368, 679 P.2d 640, 645 (1984) (The trier of fact must determine whether "a contract existed between the parties by virtue of the 1962 policy manual...."); *Jackson v. Minidoka Irrigation District,* 98 Idaho 330, 334, 563 P.2d 54, 58 (1977) (This Court enforces the right to a pre-termination hearing, since "a hearing is provided as a matter of contract (the handbook).").....

... Chief Justice Donaldson made it abundantly plain that an employee who by contract could be discharged only for limited reasons, in addition to one with a term of employment, was not an "at will" employee. *MacNeil, supra,* 108 Idaho at 589, 701 P.2d at 209; *see also Hayward v. Henderson,* 623 F.2d 596, 597 (9th Cir.1980) *quoting Maloney v.*

---

**6.** "An exception to the rule that an employee 'at will' may be discharged at any time is 'when the motivation for discharge contravenes public

policy.' *MacNeil, supra,* 108 Idaho at 589, 701 P.2d at 209." *Harkness, supra,* 110 Idaho 356 n.1, 715 P.2d 1286 n. 1.

*Sheehan,* 453 F.Supp. 1131, 1142 (D.Conn.1978) ("A law establishes a property interest in employment if it restricts the grounds on which an employee may be discharged. For example, if discharge can only be for 'just cause,' an employee has a right to continued employment until there is just cause to dismiss him. See, *Arnett v. Kennedy,* 416 U.S. 134, 151–52, 94 S.Ct. 1633, 1642–43, 40 L.Ed.2d 15 (1974)."). *Harkness, supra,* 110 Idaho 353–57, 715 P.2d 1283–87.

■ Applying *Harkness* to the facts of this case shows that Walhof and Cheadle were "at will" employees. They can point to nothing which suggests that they had anything more than a "mere hope of continued employment." *Id.,* 110 Idaho 356, 715 P.2d 1286. We find no evidence of any contract or other agreement which limited in any way the grounds upon which they might be discharged. Furthermore, Walhof and Cheadle can point to no public policy that is contravened by their discharge. Hence, because there is nothing in state law which creates any property interest on behalf of the plaintiffs—which necessarily renders the holding in *Loudermill* inapplicable—we hold that they have not been denied procedural due process under the facts of this case.

## VI. PLAINTIFFS HAVE NOT ADEQUATELY MADE OUT CLAIMS OF VIOLATIONS OF § 504 OF THE REHABILITATION ACT OF 1973

The plaintiffs claim (1) that the three counts of their amended complaint, which allege violations of Idaho's Open Meetings Law, the First Amendment, and due process, also support claims under § 504 of the Rehabilitation Act of 1973, found at 29 U.S.C. § 794 (Supp.1984); (2) that the defendants have impliedly consented to consideration of this issue; and (3) that they are entitled to relief under the Act. Without deciding their first two arguments, we

rule against them on their third claim, and hold that plaintiffs have failed to state a *prima facie* case under the Act.

■ In order to state a claim of relief based on a violation of § 504, a plaintiff must prove: (1) that he or she is handicapped; (2) that he or she is otherwise qualified for the position sought; (3) that he or she has been discriminated against solely by reason of the handicap; and (4) that the position exists as part of a program or activity receiving federal financial assistance. *Doe v. New York University,* 666 F.2d 761, 774–75 (2d Cir.1981); *see also Prewitt v. United States Postal Service,* 662 F.2d 292, 306 (5th Cir.1981); *Guerriero v. Schultz,* 557 F.Supp. 511, 513 (D.D.C. 1983).

The purpose of the Rehabilitation Act of 1973 is to "provide assistance to the whole population of handicapped persons" in the United States. *Shirey v. Devine,* 670 F.2d 1188, 1193 (D.C.Cir.1982). Among other things, the Act prohibits discrimination against "otherwise qualified handicapped individual[s]" in federally funded programs. 29 U.S.C. § 794. The Act goes a long way toward rectifying serious wrongs which exist with respect to the opportunity handicapped individuals have had in participating in federally sponsored programs. The Act does not, however, make *any* discharge of a handicapped individual discriminatory *per se.* It is for this reason that plaintiffs alleging wrongs under the Act must satisfy the four requirements mentioned above.

Turning to those requirements, we hold that neither Gardner nor Walhof have created a factual issue with respect to the third requirement. The evidence simply fails to suggest that Gardner was precluded participation in the process resulting in Walhof's dismissal, or that Walhof was in fact dismissed, *solely* because of their handicap.[7]

---

7. Because plaintiffs have failed to make out a *prima facie* case under the Act with respect to the third requirement, we need not decide whether the fourth requirement has also been satisfied.

Walhof argues that I.C. § 67–5409, which states that "preference shall be given to qualified blind persons in filling the position of executive director of the [blind] commission," creates a "rebuttable presumption of discrimination," Appellant's Brief, p. 106, in her discharge. Whether that be true or not we need not decide, because we hold that the *mere* hiring of a sighted individual (Barton) to replace Walhof does not satisfy the requirement set forth above that the handicapped person show that "he or she has been discriminated against *solely* by reasons of the handicap." *Ante,* p. 1198 (emphasis added). This is especially true when we consider the depositions of the various parties, which we have discussed above, and which state that Walhof was not excluded because she is blind, but because she was perceived as being too aggressive in her handling of personnel matters. We therefore reject plaintiffs' claims on this issue.

## VII. PLAINTIFFS HAVE FAILED TO ADEQUATELY ALLEGE A DEFAMATION CLAIM

In their brief, appellants raise for the first time a defamation claim against Governor Evans and Peterson. We hold that they are precluded from doing so. No such claim was ever pled by the appellants, and no such claim was ever argued before or decided by the district court.

It has been the rule in Idaho that "issues considered on summary judgment are those raised by the pleadings." *Argyle v. Slemaker,* 107 Idaho 668, 669, 691 P.2d 1283, 1284 (Ct.App.1984); *see also First Security Bank of Idaho, N.A. v. Absco Warehouse, Inc.,* 104 Idaho 853, 855, 664 P.2d 281, 283 (Ct.App.1983). The facts of this case show that the issue of defamation has in no way been raised by the pleadings; there is nothing within the pleadings which can fairly be viewed as adequately giving notice of the claim. We accordingly decline to rule on this claim at this late date.

For the foregoing reasons, we affirm the district court. Costs to respondents; no attorney's fees.

DONALDSON, C.J., BAKES and HUNTLEY, JJ., and McFADDEN, J. pro tem, concur.