730 P.2d 942 (1986)
112 Idaho 22
In the Matter of the Petition of STEVE B.D. and Linda Sue D., Adopting Parents.
STEVE B.D. and Linda Sue D. Petitioners-Respondents,
v.
Chester SWAN, Intervenor-Appellant.
No. 16372.
Supreme Court of Idaho.
December 3, 1986.
Rehearing Denied January 30, 1987.
*943 G. Philip Bernstein, Boise, for intervenor-appellant.
Scott E. Fouser (argued), Caldwell, Robert M. Tyler, Jr., and Bobbi K. Dominick, Boise, for petitioners-respondents.
PER CURIAM.
Chester Swan is the admitted father of a baby born March 5, 1984 to a then unmarried woman. The mother alone executed a judicial consent to the adoption of the baby, and then declared a revocation of that consent. The attempted revocation was denied. DeBernardi v. Steve B.D., 111 Idaho 285, 723 P.2d 829 (1986). Swan appeals from the decisions of the magistrate and the district court that his consent to Mr. and Mrs. D.'s adoption of the child was not required. He alleges this violated his constitutionally protected interest in the opportunity to develop a parental relationship with the child. We affirm the determinations below that because Swan had not established such an interest, and was not denied an opportunity to establish such a relationship, his consent to the adoption was not required.

I.
Swan and DeBernardi lived together from October, 1982, to June, 1983. They were not married at the time. In June of that year, DeBernardi learned she was pregnant. Swan moved out in late June, then returned in late July and remained until the middle of September. Swan and DeBernardi did not live together again until after the birth of the child.
Prior to the birth, DeBernardi made several purchases related to infant care, including a crib. Swan was aware of these purchases. Swan testified that he and DeBernardi had planned to raise the child together, and that he always intended to act as a parent to the child.
DeBernardi gave birth to the child on March 5, 1984. Swan visited DeBernardi and the child twice while they were at the hospital. On one of these occasions he carressed and kissed the child. Without Swan's knowledge or consent, DeBernardi surrendered custody of the child on March 6. On March 7, before the magistrate court, she consented to Mr. and Mrs. D's adoption of the child. She testified that *944 she did not know the identity of the child's father.
DeBernardi later attempted to revoke her consent. Between the time of surrendering custody and consenting to adoption and April 26, with a hearing pending on her attempt to revoke, DeBernardi concealed from Swan the fact of her surrendering custody and consenting to the adoption of the child. She gave various excuses, including inclement weather and the child's illness, to explain why she could not bring the child to see Swan at his residence. She also regularly visited Swan to minimize the likelihood that he would visit her. In addition, DeBernardi informed Swan that her mother was staying at her residence (which she in fact was doing). Swan testified that he felt awkward around DeBernardi's mother because he was older than she, and that he wished to avoid seeing her. DeBernardi promised that she would bring the child to stay with Swan during the coming Easter weekend. When Easter arrived, she told Swan that the child could not come because he had the measles.
During this period Swan did not pay either medical expenses related to the birth or any expenses related to the child's support. Swan testified to his belief that DeBernardi's insurance covered the medical expenses.
When DeBernardi learned that Mr. and Mrs. D. were going to publish legal notice of the upcoming hearing for the benefit of the then unknown father, she informed Swan of the situation. At this time, Swan refused DeBernardi's request to sign a paternity affidavit. He later testified that he refused because he could see no reason for doing so, since he was going to testify as to paternity at the revocation hearing.
Swan appeared at the revocation hearing on May 11. He testified to his paternity, to his wish to reunite the child "with his mother and his brothers and sisters," and to his desire to help raise the child. At the time, Swan apparently was not living with DeBernardi. On May 31 the magistrate court issued its memorandum decision denying DeBernardi's request to revoke her consent. Ultimately, this Court affirmed that denial. DeBernardi, supra.
Thereafter, while DeBernardi appealed the magistrate's decision, Swan entered the dispute in his own right. On June 14, Swan signed an acknowledgement of paternity, and on June 27 moved to intervene in the proceedings related to DeBernardi's consent and applied for custody of the child. On September 4, the magistrate granted Swan's motion to intervene, but denied his application for custody pending a determination of the extent of his parental interest.
On November 15, Swan and DeBernardi executed an acknowledgement of common law marriage.
Following a hearing on the extent of Swan's parental interest, the magistrate issued a decision on March 14, 1985, holding that Swan's consent was unnecessary to the pending adoption. Swan appealed to the district court. The district court first remanded for additional findings of fact. The magistrate complied. Subsequently, in a decision issued on January 24, 1986, the district court affirmed the decision of the magistrate court. This appeal followed.

II.
On appeal Swan contends, inter alia, that the denial of his ability to prevent the child's adoption violated his constitutionally protected interest in the opportunity to develop a parental relationship with the child. Swan relies solely on the provisions of the Federal Constitution. As we recently and unanimously noted, "[p]referably, when addressing constitutional issues, our state constitutional provisions should be reviewed first before turning to the federal constitution." Gardner v. Evans, 110 Idaho 925, 932 n. 1, 719 P.2d 1185, 1192 n. 1 (1986) (quoting Nampa Christian Schools v. Department of Employment, 110 Idaho 918, 936 n. 3, 719 P.2d 1178, 1196 n. 3 (1986)); see also Wells v. Children's Aid Society of Utah, 681 P.2d 199 (Utah 1984) (addresses rights of unwed father under Utah Constitution). However, because Swan failed to allege a violation of the *945 Idaho Constitution, we will address only the implications of the Federal Constitution.
A parent's relationship with his or her child constitutes an interest in liberty entitled to the protection of the Fourteenth Amendment of the United States Constitution, even if that parent is an unwed father. Lehr v. Robertson, 463 U.S. 248, 256-68, 103 S.Ct. 2985, 2990-97, 77 L.Ed.2d 614 (1983); Caban v. Mohammed, 441 U.S. 380, 388-89, 99 S.Ct. 1760, 1766, 60 L.Ed.2d 297 (1979); Stanley v. Illinois, 405 U.S. 645, 649, 92 S.Ct. 1208, 1211, 31 L.Ed.2d 551 (1972). However, the unwed father must show more than a mere biological relationship to establish his interest. The Supreme Court explained:
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie. Lehr, supra, 463 U.S. at 262, 103 S.Ct. at 2993-94 (footnote omitted).
Thus, in order to secure the protection of the Fourteenth Amendment Due Process and Equal Protection Clauses, the unwed father must "grasp[] the opportunity" to make a significant custodial, personal, financial, and legal connection with the child. Id.; Caban, supra, 441 U.S. at 389 n. 7, 99 S.Ct. at 1766 n. 7; Quilloin v. Walcott, 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978).
Lehr indicated both that the state may not deny due process and equal protection to unwed fathers who enjoyed established relationships with their children, and that the state may not deny unwed fathers the opportunity to establish such relations  what the Court described as "the inchoate interest in establishing a relationship with [the child]... ." Lehr, supra, 463 U.S. at 262-65, 103 S.Ct. at 2993-95; In re Baby Girl M., 37 Cal.3d 65, 207 Cal. Rptr. 309, 688 P.2d 918, 924 (1984); see generally E. Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson, 45 Ohio State L.J. 313, 361-62 (1984). Lehr establishes no measure of time constituting an adequate opportunity. However, because of a child's urgent need for permanence and stability, the unwed father must act quickly to take responsibilities and establish ties (as did, for example, the unwed father in Baby Girl M). Professor Elizabeth Buchanan observed: "The basis for constitutional protection is missing if the parent seeking it does not take on the parental responsibilities timely. The opportunity is fleeting. If it is not, or cannot be grasped in time, it will be lost." Buchanan, supra, 45 Ohio State L.J. at 364; accord, Baby Girl M., supra, 207 Cal. Rptr. at 316, 688 P.2d at 925. The fleeting opportunity may pass ungrasped through no fault of the unwed father or perhaps due to the interference of some private third party; nevertheless, once passed the unwed father is left without an interest cognizable under the Fourteenth Amendment. Lehr, supra, 463 U.S. at 267-68, 103 S.Ct. at 2996-97 (Held that the Fourteenth Amendment afforded no protection to an unwed father who "never established a relationship" with the child, even though the mother had impeded his efforts.); Buchanan, supra, 45 Ohio State L.J. at 368. No violation of the Fourteenth Amendment lies unless "state action," not merely the actions of private persons, thwarts the unwed father's "grasp." Buchanan, supra, 45 Ohio State L.J. at 361.
In sum, where the unwed father has not developed a substantial relationship with the child, and has not been denied the opportunity by the state, he has no interest protected by the Fourteenth Amendment, and the state is not required to obtain the father's consent to the child's adoption. Lehr, supra, 463 U.S. at 262-68, 103 S.Ct. at 2994-97; Caban, supra, 441 U.S. at 392, *946 99 S.Ct. at 1768. We turn now to the facts of this particular case.
Having reviewed the record, we cannot disagree with the conclusion of Magistrate Drescher, which conclusion was affirmed by the district court, that prior to his motion to intervene Swan "never established a significant custodial, personal, or financial relationship with the child so as to require his consent to the adoption." Further, an opportunity to do so existed during the time preceding his intervention, which Swan did not grasp through no fault of Mr. and Mrs. D. or the state. We will enumerate some of the facts supporting this conclusion.
As the Lehr Court noted: "The most effective protection of the putative father's opportunity to develop a relationship with his child is provided by the laws that authorize formal marriage and govern its consequences." Lehr, supra, 463 U.S. at 263, 103 S.Ct. at 2994. For whatever reason, Swan and DeBernardi did not marry prior to the child's birth, and not until six months after DeBernardi's request to revoke consent had been denied.
Swan did not pay any expenses related to the birth or the support of the child. A person of limited means cannot be required to give that which he does not have. Still, financial support in any form or amount is one means by which an unwed father can establish a significant relationship with his child. Lehr, supra, 463 U.S. at 262, 103 S.Ct. at 2994.
Most significantly, during the time between his initial visits to the hospital and the day DeBernardi informed him of her surrendering the child, a period of some fifty-one days, Swan made no attempt to interact with the child. As far as Swan knew, the child was home with DeBernardi. Had Swan insisted upon seeing the child, he could have learned earlier of the adoption proceedings and acted earlier to establish his interest. The fact that DeBernardi actively concealed from Swan the adoption proceedings is of no avail to Swan. As previously observed, a violation of the Fourteenth Amendment cannot be premised upon the independent actions of a private individual. The essential fact is that Swan failed to initiate either contact with the child or any legal actions to establish his interest, whether or not Swan was to blame for these failures.
Upon learning of DeBernardi's actions, Swan still took no action to establish his interest in relations with the child. He refused to sign a paternity affidavit. At the hearing on DeBernardi's request to revoke her consent to the adoption, he testified on behalf of her parental rights rather than his own. Although he testified to his paternity and his desire to help in some fashion to raise the child, he did not testify to his desire to fill the role of a father. Rather, he asserted his wish that the child be reunited "with his mother and brothers and sisters." Such a reunion would not have included Swan, as he was not living with DeBernardi at the time.
It was not until a month after the magistrate had denied DeBernardi's request to revoke consent that Swan moved to intervene in his own right and applied for custody of the child. Only at that point did the state have any role in denying Swan the opportunity to establish a relationship with the child. But by that time the child had been in the care and custody of Mr. and Mrs. D. and adoption proceedings had progressed for nearly four months. By that point, the time had passed for Swan to assert an interest in a relationship with the child sufficient to reverse the already well-advanced adoption proceedings and sever the already well-established bond between baby and adoptive parents. To effectively assert an "opportunity" interest, an unwed father must act early in proceedings on custody and adoption. See Baby Girl M., supra, 688 P.2d at 920 (Unwed father takes action immediately following birth.).
We imply no condemnation of Swan; nor do we doubt the sincerity of his present desire for custody. It may be that the designs of DeBernardi and his own naivete concerning legal proceedings and requirements conspired against his timely action. *947 Nevertheless, the critical fact remains that the opportunity to assert his interest slipped away without any involvement of the state. We hold that Swan had no interest in a relationship with the child and that the state did not deny him the opportunity to establish such a relationship prior to the time he intervened; consequently his consent to the adoption was not required.
Having affirmed the decisions of the magistrate and district courts which effectively terminated Swan's parental interest, we need not address the questions of whether the courts below unduly emphasized the child's welfare over Swan's rights, and of whether Swan's parental rights were wrongfully terminated without satisfying the requirements of I.C. § 16-2001 et seq. These essentially were alternative means to reach the same end.
Affirmed. Costs to respondents, without an award of attorney's fees.
SHEPARD, J., concurs in the result.