2007 UT 38

**Nikolas L. THURNWALD, Plaintiff and Appellant,**

v.

**A.E., Defendant and Appellee.**

No. 20050721.

Supreme Court of Utah.

May 8, 2007.

Rehearing Denied June 27, 2007.

Michael J. Boyle, Daniel S. Drage, Ogden, for plaintiff.

David M. McConkie, David J. Hardy, Salt Lake City, for defendant.

On Certification from the Utah Court of Appeals.

DURRANT, Justice:

## INTRODUCTION

¶ 1 By statute, an unwed father must, in order to preserve his paternal rights, file a paternity petition in court and register a notice of that petition with the Department of Health.[1] These documents may be filed before the child's birth, but must be filed before the mother consents to adoption or relinquishes the child to an adoption agency.[2] The mother is required to wait twenty-four hours after the child's birth before consenting to adoption or relinquishing the child.[3] Thus, the typical unwed father is allowed a period that extends until twenty-four hours following the child's birth to file the requisite petition and to register a notice—or risk losing all rights to the child.

¶ 2 The question posed in this case is whether the period provided by statute in which unwed fathers may preserve their rights by filing a paternity action and registering notice should be enlarged when it expires on a weekend or holiday. More specifically, the question is whether rule 6 of the Utah Rules of Civil Procedure applies to

---

1. *See* Utah Code Ann. §§ 78–30–4.13(3)(a), –4.14(6) (Supp.2006); *accord id.* § 78–30–4.13(3)(a) (Supp.2004), *amended by* ch. 137, § 6 & ch. 150, § 5, 2005 Utah Laws 894–96, 1017–18; Utah Code Ann. § 78–30–4.14(2)(b) (Supp. 2004), *repealed and reenacted by* ch. 186, § 3, 2006 Utah Laws 835–37.

2. Utah Code Ann. §§ 78–30–4.13(3)(d), –4.14(6) (Supp.2006); *accord id.* §§ 78–30–4.13(3)(a), –4.14(2)(b) (Supp.2004).

3. *Id.* § 78–30–4.19(1) (Supp.2006).

enlarge these statutory deadlines. In this case, Nikolas Thurnwald did not file his paternity petition and register notice prior to his child's premature birth on Saturday morning of Labor Day weekend, and he was thereafter unable to file until the next Tuesday because the courts and state offices were closed. Meanwhile, the mother, A.E., relinquished their child to L.D.S. Family Services for adoption on Sunday morning, at the expiration of the twenty-four-hour waiting period. Thurnwald's paternity petition was dismissed by the district court because he had not filed his petition and registered with the state prior to A.E.'s relinquishment. Thurnwald argues on appeal that we should apply rule 6 and deem his petition timely.

¶ 3 This case presents us with two alternatives for interpreting the statutes: (1) we could conclude, as did the district court, that the twenty-four-hour postbirth period is designed solely for the benefit of the mother and that the unwed father's obligation is tied in all instances to the mother's relinquishment—not to any time period to which rule 6 applies; or (2) we could conclude that the effect of the statutes is to create a minimum filing period extending to twenty-four hours after the child's birth in which the unwed father has a right to file and register, and that this period is subject to extension under rule 6.

¶ 4 We hold that the first of these two alternatives, the one selected by the district court, is unconstitutional because it denies unwed fathers a postbirth time period in which to file and register if the birth falls on a weekend or holiday. When faced with two plausible interpretations of a statute, one constitutional and the other not, we are obligated to select the constitutional interpretation. Accordingly, we hold that rule 6 applies to enlarge the filing period until the end of the next business day in cases where the unwed father would not otherwise receive a full business day to file postbirth because part or all of the twenty-four-hour period falls on a holiday or weekend.

4. *Johnson v. Hermes Assocs., Ltd.*, 2005 UT 82, ¶ 2, 128 P.3d 1151 ("When reviewing a rule 56(c) motion for summary judgment, we recite the

## BACKGROUND

▮ ¶ 5 The district court dismissed Thurnwald's petition after granting summary judgment against him; so we recite the facts in the light most favorable to Thurnwald.[4]

¶ 6 Thurnwald and A.E. were involved in a romantic relationship for more than three years, and they lived together from August 2003 to April 2004. They were living together in Davis County in early 2004 when A.E. became pregnant with their child. Thurnwald and A.E. initially discussed marriage and continued to live together. But in April 2004, A.E. moved out and went to live with her grandparents. During most of the pregnancy, A.E. was covered by her grandmother's health insurance.

¶ 7 After A.E. moved out, she and Thurnwald continued to date. They also had discussions about how to best prepare for the birth of their child. About a month after A.E. went to live with her grandmother, Thurnwald and A.E. agreed that Thurnwald should move to Fruitland to work with his grandfather's company so he would have better working hours and be better able to afford to buy a house and support the child. In accordance with this plan, Thurnwald moved to Fruitland to start working and find a place to live. While there, he talked with A.E. on the phone daily and visited on the weekends. Approximately three weeks later, A.E. decided that she did not want to move to Fruitland; so Thurnwald moved back to Davis County.

¶ 8 The parties also discussed raising the child together and moving in with Thurnwald's parents. About a month before the child's birth, they discussed Thurnwald joining the military to provide a steady job and insurance for the family. And they discussed purchasing family insurance.

¶ 9 During A.E.'s pregnancy, Thurnwald went to all but one of her doctor appointments. He went shopping with A.E., and together they purchased several outfits for the baby. Thurnwald also purchased a car

facts in the light most favorable to the non-moving party.").

seat, bassinet, crib, diaper bag, diapers, and some blankets.

¶ 10 On approximately August 17, 2004, A.E. told Thurnwald that, with her grandmother's encouragement, she had gone to an appointment at L.D.S. Family Services to talk about adoption. The next day, Thurnwald and A.E. went to the L.D.S. Family Services office along with Thurnwald's mother. Thurnwald was told at that meeting that nothing was finalized but that A.E. had signed papers stating that L.D.S. Family Services would take care of the baby's birth if A.E. decided to give the baby up for adoption. The representative told Thurnwald and his mother to stop pressuring A.E. and let her make her own decision.

¶ 11 After the meeting at L.D.S. Family Services, A.E. told Thurnwald that she did not want to give the baby up for adoption and that he did not have anything to worry about. Nonetheless, between August 18 and the child's birth, Thurnwald's mother made several calls on Thurnwald's behalf to determine his rights regarding the child, including calls to a lawyer and to the Department of Health. The Department of Health told them to get a lawyer if they thought the baby might be placed for adoption. The lawyer told them he would look into it and get back to them.

¶ 12 On August 21, approximately two weeks before the child's birth, Thurnwald and A.E. together attended a baby shower for the child and received gifts to help care for a newborn. Approximately two days before the child's birth, Thurnwald and A.E. talked about selling his car and getting a car more suitable for the child.

¶ 13 On Saturday, September 4, 2004, A.E. went into premature labor. The child was born that day at 9:24 a.m. in Layton, Utah. Neither A.E. nor her family notified Thurnwald.

¶ 14 Thurnwald found out about the birth from one of A.E.'s co-workers at approximately 10:30 a.m. that same day when he called A.E.'s workplace to see if she wanted to go with him to a movie that night. Upon hearing that A.E. had given birth, Thurnwald called A.E. at the hospital. She told him that she was giving their child up for adoption. Thurnwald left work immediately and drove to the hospital. When he got there, A.E. refused to see him. Hospital personnel told Thurnwald that A.E. had registered as a "silent" patient and that he could not visit or speak with her or the child.

¶ 15 That same day, Thurnwald contacted his lawyer. But Thurnwald was unable to file the required paternity petition with the court and register with the Department of Health on Sunday or Monday because it was Labor Day weekend and state offices and courts were closed. Instead, he filed a paternity petition with the court on Tuesday, September 7, at 12:05 p.m., and filed a notice with the registrar of vital statistics on the same day. In conjunction with the petition for paternity, he also filed an Order to Show Cause to stop any adoption proceedings.

¶ 16 In the meantime, A.E. waited twenty-four hours as required by statute and then, on Sunday morning, relinquished custody of the child to L.D.S. Family Services for adoptive placement.

¶ 17 At a hearing on the paternity petition, the parties agreed to continue the matter based on an agreement with L.D.S. Family Services that it would not finalize the adoption until this matter was concluded. Thereafter, on July 22, 2005, the district court granted summary judgment against Thurnwald because he did not file his paternity petition and notice before A.E.'s relinquishment. The district court concluded that, because it was not "impossible for him to comply with the filing requirements of the statute," Thurnwald's right to due process was not violated. The district court then dismissed the paternity petition in an order dated August 17, 2005. Thurnwald originally appealed this case to us, but we transferred it to the court of appeals because we lacked original appellate jurisdiction over the case. After the parties filed their appellate briefs, the court of appeals certified this case back to us. We have jurisdiction pursuant to Utah Code section 78–2–2(3)(b).

## STANDARD OF REVIEW

¶ 18 Because Thurnwald appeals from the district court's grant of summary judg-

ment, this case presents only questions of law that we review for correctness, "giv[ing] no deference to the district court's legal decisions." [5]

## ANALYSIS

¶ 19 Utah's adoption statutes [6] require unwed fathers who desire to preserve their paternal rights to both file a paternity petition in court and register a notice of that petition with the state registrar of vital statistics in the Department of Health.[7] Both of these documents must be filed prior to either the birth mother's consent to adoption or her relinquishment of the child to an adoption agency,[8] but the mother may not consent "until at least 24 hours after the birth of her child." [9] The unwed father's strict compliance with the statute is mandated.[10] The consequence of failing to timely file a paternity petition and register is the loss of "any right in relation to the child," including the

right to notice of adoption proceedings and the right to consent or withhold consent to the child's adoption.[11]

¶ 20 In effect, the adoption statutes give an unwed father until twenty-four hours after the birth of his child to file a paternity petition and register—or risk losing all rights to his child. After the twenty-four-hour postbirth waiting period, the birth mother may consent to adoption or may relinquish the child to the custody of an adoption agency at any time and in so doing immediately deprive the father of any rights to the child.

¶ 21 Thurnwald argues that because the twenty-four-hour postbirth period expired on a holiday weekend, rendering him unable to preserve his paternal rights after the birth of the child, the district court should have applied rule 6 of the Utah Rules of Civil Procedure to enlarge the time for filing to the end

---

5. *Fericks v. Lucy Ann Soffe Trust*, 2004 UT 85, ¶ 10, 100 P.3d 1200.

6. Some of the relevant adoption statutes have been amended since 2004 when Thurnwald filed his petition for paternity. We cite the current statutes, but also reference the statutes then in effect. Unless otherwise noted, the amended statutes contain only organizational and stylistic changes, and have the same practical effect as those in effect in 2004.

7. Utah Code Ann. §§ 78–30–4.13(3)(a), –4.14(6) (Supp.2006); *accord id.* § 78–30–4.13(3)(a) (Supp.2004), *amended by* ch. 137, § 6 & ch. 150, § 5, 2005 Utah Laws 894–96, 1017–18; Utah Code Ann. § 78–30–4.14(2)(b) (Supp.2004), *repealed and reenacted by* ch. 186, § 3, 2006 Utah Laws 835–37.

   The current version of section 78–30–4.13(3) reads as follows:
   (a) In order to preserve any right to notice and consent, an unmarried biological father may, consistent with Subsection 3(d):
     (i) initiate proceedings to establish paternity ...; and
     (ii) file a notice of the initiation of the proceedings described in Subsection (3)(a)(i) with the state registrar of vital statistics within the Department of Health.
   ....
   (d) The action and notice described in Subsection (3)(a):
     (i) may be filed before or after the child's birth; and
     (ii) shall be filed prior to the mother's:
       (A) execution of consent to adoption of the child; or

       (B) relinquishment of the child for adoption.
   The predecessor of this section in effect in 2004 when Thurnwald filed his paternity petition reads as follows:
     (3)(a) In order to preserve any right to notice and consent, an unmarried biological father may initiate proceedings to establish paternity ... and file a notice of the initiation of those proceedings with the state registrar of vital statistics within the Department of Health prior to the mother's execution of consent or her relinquishment to an agency. That action and notice may also be filed prior to the child's birth.
   Utah Code Ann. § 78–30–4.13(3)(a) (Supp.2004).
     Thurnwald cites the 2004 version of this statute in his brief; A.E. cites the 2006 version in hers. Neither party addresses whether the changes in this statute are relevant to our analysis. We therefore assume that the parties agree that the statute in effect in 2004 and the current statute require the same actions of unwed fathers who wish to establish paternity to a child.

8. Utah Code Ann. §§ 78–30–4.13(3)(d), –4.14(6) (Supp.2006); *accord id.* §§ 78–30–4.13(3)(a), – 4.14(2)(b) (Supp.2004).

9. *Id.* § 78–30–4.19(1) (Supp.2006).

10. *Id.* § 78–30–4.14(11); *accord id.* § 78–30– 4.14(5) (Supp.2004).

11. *Id.* § 78–30–4.14(11) (Supp. 2006); *accord id.* § 78–30–4.14(5) (Supp.2004).

of the next business day after the child's birth. Rule 6 provides:

> In computing any period of time prescribed or allowed by ... any applicable statute, ... [t]he last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday.[12]

If rule 6 applies, Thurnwald argues, his petition was timely because it was filed before the end of the first full business day after his child's birth. Further, Thurnwald asserts that if rule 6 does not apply, the statutes unconstitutionally deprive him of his right to due process.

¶ 22 On the other hand, A.E. argues that the twenty-four-hour waiting period is intended to benefit the birth mother, not the unwed father, and that rule 6 cannot be used to enlarge the time for filing because the relevant statutory deadline is ultimately the time of the mother's consent or relinquishment. According to A.E., the statute governing the time period for filing a paternity petition "reveals an unambiguous legislative intent to require that unmarried biological fathers demonstrate a commitment to parenthood prior to a mother's relinquishment."

¶ 23 In sum, we are presented with two alternative interpretations of the statutes controlling fathers' parental rights: (1) that the twenty-four-hour postbirth period is designed solely for the benefit of the mother and that the unwed father's filing period is tied in all instances to the mother's relinquishment, so that rule 6 is inapplicable; or (2) that the statutes create a minimum filing period that extends to twenty-four hours after the child's birth and may be enlarged in accordance with rule 6 of the Utah Rules of Civil Procedure if the last day of the period occurs on a weekend or holiday.

¶ 24 The district court adopted the first interpretation in granting summary judgment against Thurnwald. We hold, however,

that application of the statutes in accordance with the district court's interpretation is unconstitutional because it would prematurely terminate an unwed father's opportunity to assert paternity when the child's birth occurs on a weekend or holiday. We first discuss the due process rights of unwed fathers and the constitutionality of Utah's adoption statutes, holding that unwed fathers cannot be denied a postbirth filing opportunity. We then address rule 6 of the Utah Rules of Civil Procedure and determine that it can be used to enlarge the deadline for filing when the twenty-four-hour postbirth period falls on a weekend or holiday.

## I. UTAH'S STATUTES VIOLATE DUE PROCESS IF THEY ARE INTERPRETED TO DEPRIVE UNWED FATHERS OF CHILDREN BORN ON WEEKENDS AND HOLIDAYS OF A POSTBIRTH OPPORTUNITY TO PRESERVE PATERNAL RIGHTS

¶ 25 Under both federal and state law, an unwed biological father has an inchoate interest in a parental relationship with his child that acquires full constitutional protection only when he "demonstrates a full commitment to the responsibilities of parenthood by [coming] forward to participate in the rearing of his child."[13] As explained by the United States Supreme Court in *Lehr v. Robertson*,[14]

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion

---

12. Utah R. Civ. P. 6.

13. *Lehr v. Robertson*, 463 U.S. 248, 261 & n. 17, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) (alteration in original) (internal quotation marks omitted);

*accord In re Adoption of B.B.D.*, 1999 UT 70, ¶ 11, 984 P.2d 967.

14. 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614.

of where the child's best interests lie.[15]

¶ 26 In *Lehr*, the United States Supreme Court recognized that individual states may define when an unwed father has grasped that opportunity. It upheld the constitutionality of New York's paternity statute against a challenge by an unwed father of a two-year-old who had failed in the two years since his child's birth to legally claim his paternity by mailing a postcard to the state's registry.[16]

¶ 27 The United States Supreme Court has not, however, determined the rights of an unwed father of a newborn child or considered whether the United States Constitution places additional restrictions on the laws a state may enact to terminate unwed fathers' opportunities to assert their rights to newborns. Some courts have interpreted *Lehr* to herald greater protection of the father's opportunity interest in cases involving newborns, reasoning that in those cases the unwed father has not yet had the opportunity to fully demonstrate the level of his commitment to the child.[17]

¶ 28 In *Wells v. Children's Aid Society of Utah*,[18] we applied a due process analysis under the Utah Constitution to give greater protection to the rights of unwed fathers of newborns. We described an unwed father's opportunity interest in developing a relationship with his newborn as a "provisional right" that is itself protected by the due process clause of the Utah Constitution.[19] And we said that "[w]e measure the statutory specifications for the termination of that provisional right against the tests of compelling state interest and narrowly tailored means."[20] But because of the state's compelling interest in assuring speedy identification of the newborn's legal parents and the narrow tailoring of the statute, we held that section 78–30–4(3), the predecessor of the adoption statutes at issue in this case, was facially constitutional.[21]

¶ 29 Under the old Utah Code section 78–30–4(3),[22] an unwed father was required to preserve his rights by registering a notice of claim to paternity with the Department of Health.[23] That section provided that the notice "may be registered prior to the birth of the child but must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services."[24] The intent of the statute was "to facilitate permanent and secure placement of illegitimate children whose unwed mothers wish to give them up for adoption and whose unwed fathers take no steps to officially identify themselves and acknowl-

15.  *Id.* at 262, 103 S.Ct. 2985.

16.  *Id.* at 263–65, 103 S.Ct. 2985.

17.  *See, e.g., Swayne v. L.D.S. Social Servs.*, 670 F.Supp. 1537, 1541 (D.Utah 1987) (noting that "[s]ome courts and commentators have determined that the potential interest recognized in *Lehr* may require greater constitutional protection if it is asserted, as in this case, at or near the time of birth rather than after a significant lapse of time as in *Lehr*," but holding that "[t]hat question need not be resolved [here]"); *In re Steve B.D.*, 112 Idaho 22, 730 P.2d 942, 945 (1986) ("*Lehr* indicated both that the state may not deny due process and equal protection to unwed fathers who enjoyed established relationships with their children, and that the state may not deny unwed fathers the opportunity to establish such relations—what the Court described as 'the inchoate interest in establishing a relationship with [the child]....' *Lehr* establishes no measure of time constituting an adequate opportunity. However, because of a child's urgent need for permanence and stability, the unwed father must act quickly ...." (quoting *Lehr*, 463 U.S. at 262–65, 103 S.Ct. 2985)); *In re X.*, 76 N.Y.2d 387, 559 N.Y.S.2d 855, 559 N.E.2d 418,

424 (1990) (considering whether unwed fathers must ever be accorded "the full measure of constitutional protection—the right to a continued parental relationship absent a finding of unfitness—... where a child is placed for adoption before any real relationship can exist," and concluding as a matter of federal law "that such an interest must be recognized in appropriate circumstances").

18.  681 P.2d 199 (Utah 1984).

19.  *Id.* at 206.

20.  *Id.*

21.  *Id.* at 206–07.

22.  Utah Code Ann. § 78–30–4(3) (Supp.1983), *repealed by* Adoption Act Amendments, ch. 245, § 24, 1990 Utah Laws 1173, 1178.

23.  Utah Code Ann. § 78–30–4(3)(b).

24.  *Id.*

edge paternity."[25] Specifically, "[t]he registration requirement was viewed as a procedure that would protect the putative father's parental rights if he timely claimed his paternity."[26] Thus, the registration statute was intended to strike a balance between two competing interests: "the significant state interest in speedily placing infants for adoption and the constitutionally protected rights of putative fathers."[27]

¶ 30 In *Wells*, the unwed father challenged the constitutionality of this statute.[28] We held the statute "facially valid," stating as follows:

[T]he state has a compelling interest in speedily identifying those persons who will assume a parental role over newborn illegitimate children. Speedy identification is important to immediate and continued physical care and it is essential to early and uninterrupted bonding between child and parents. If infants are to be spared the injury and pain of being torn from parents with whom they have begun the process of bonding and if prospective parents are to rely on the process in making themselves available for adoptions, such determinations must also be final and irrevocable.

Section 78–30–4(3) is narrowly tailored to achieve the purposes identified above. No infringement of the unwed father's rights not essential to the statute's purposes has been identified. Due process does not require that the father of an illegitimate child be identified and personally notified before his parental right can be terminated. In the common cases of unwed fathers without desires to assume the responsibilities and to claim the rights of parenthood, such a requirement would frustrate the compelling state interest in the speedy determination described above.[29]

In subsequent cases, we continued to uphold the constitutionality of the old section 78–30–4 without engaging in additional analysis.[30]

¶ 31 In *Wells*, we additionally held that the unwed father's as-applied due process challenge could not succeed because it had been possible for him to register before the birth mother consented to their child's adoption.[31] Wells's biological child was born in Salt Lake City on September 23, 1981.[32] Wells, who lived in Moab, Utah, mailed his registration form to the Department of Health in Salt Lake City on that same day, but the form did not reach the Department of Health until September 30.[33] In the meantime, on September 24, the birth mother consented to the child's adoption.[34] Thus, Wells's registration was seven days late. In rejecting his as-applied challenge, we noted that Wells could not show that it had been impossible for him to file because he had "ample advance notice of the expected time of birth and the fact that the mother intended to relinquish the child for adoption, advice of counsel on filing the required form, and a copy of the form provided by a social worker for the department."[35] Wells had signed the form on September 18, but he said that he did not mail it until September 23 because he was waiting to ensure that the baby was his; if it was born any later he would have believed that someone else was the father.[36]

**25.** *Swayne v. L.D.S. Social Servs.*, 795 P.2d 637, 641 (Utah 1990).

**26.** *In re Adoption of W.*, 904 P.2d 1113, 1117 (Utah Ct.App.1995) (citing Recording of Utah Floor Debates, 41st Leg., February 6, 1975).

**27.** *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 691 (Utah 1986).

**28.** *See Wells*, 681 P.2d at 207.

**29.** *Id.* at 206–07.

**30.** *In re B.B.D.*, 1999 UT 70, ¶ 18, 984 P.2d 967; *Swayne v. L.D.S. Social Servs.*, 795 P.2d 637, 641–43 (Utah 1990); *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689 (Utah 1986); *Sanchez v. L.D.S. Social Servs.*, 680 P.2d 753, 755 (Utah 1984).

**31.** *Wells*, 681 P.2d at 207.

**32.** *Id.* at 201.

**33.** *Id.*

**34.** *Id.*

**35.** *Id.* at 207–08.

**36.** *Id.* at 202.

¶ 32 Our decision in *Wells* is in many respects relevant to our analysis of the constitutionality of the adoption statutes and their effect in this case. Although the adoption code has been overhauled several times since we decided *Wells*,[37] the statutory language at issue in that case was very similar to the language in the present statutes that requires unwed fathers to file prior to the mother's consent or relinquishment. But in *Wells* we did not consider the issue raised here—whether the statute can be constitutional if it completely cuts off postbirth rights of unwed fathers when the child is born on a weekend or holiday. In upholding the old section 78–30–4, we said only that "[n]o infringement of the unwed father's rights not essential to the statute's purposes has been identified."[38]

¶ 33 In this case, we therefore consider whether the infringement upon the unwed father's provisional right caused by interpreting the statutes to make it impossible for unwed fathers of children born on weekends or holidays to preserve their rights postbirth is necessary to achieve the state's compelling interests. While in the past the adoption statutes required only that unwed fathers register with the state before the mother consented to adoption or relinquished the child, the adoption statutes now require an unwed father to both register notice and file a paternity petition before the child is relinquished. In addition, if the unwed father of a newborn desires to establish a right to withhold consent to his child's adoption (rather than simply to receive notice of the adoption and an opportunity to present evidence regarding the child's best interests),[39] he must file in the paternity action a sworn affidavit "stating that he is fully able and willing to have full custody of the child[,] ... setting forth his plans for care of the child[,] and ... agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth."[40] He must also have "offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability."[41] These actions must all be taken before the mother consents to adoption or relinquishes the child.[42]

¶ 34 As we previously held in *Wells*, it is beyond dispute that "the state must ... have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted."[43] The state also has compelling interests in promoting "early and uninterrupted bonding between child and parents" and in facilitating final and irrevocable adoptions.[44]

37. *See, e.g.,* Adoption Amendments, ch. 187, 2006 Utah Laws 834; Adoption Amendments, ch. 137, 2005 Utah Laws 891; Adoption Amendments, ch. 122, 2004 Utah Laws 546; Adoption Act Revision, ch. 168, 1995 Utah Laws 531; Adoption Act Amendments, ch. 245, 1990 Utah Laws 1173; *see also In re Adoption of W.*, 904 P.2d 1113, 1118–19 (Utah Ct.App.1995) (explaining 1990 overhaul of adoption statutes).

38. *Wells*, 681 P.2d at 207.

39. *See* Utah Code Ann. § 78–30–4.13(11) (Supp. 2006); *accord id.* § 78–30–4.13(11) (Supp.2004), *amended by* ch. 137, § 6 & ch. 150, § 5, 2005 Utah Laws 894–96, 1017–18.

40. Utah Code Ann. § 78–30–4.14(6)(b) (Supp. 2006); *accord id.* § 78–30–4.14(2)(b)(i) (Supp. 2004), *repealed and reenacted by* ch. 186, § 3, 2006 Utah Laws 835–37.

41. Utah Code Ann. § 78–30–4.14(6)(d) (Supp. 2006); *accord id.* § 78–30–4.14(2)(b)(iii) (Supp. 2004).

42. *Id.* § 78–30–4.14(6) (Supp.2006); *accord id.* § 78–30–4.14(2) (Supp.2004).

43. *Wells*, 681 P.2d at 203.

44. *Id.* at 206. Since we held in *Wells* that the paternity statutes then in effect were necessitated by compelling state interests, the Legislature enacted section 78–30–4.12, codifying the compelling interests that we previously discussed and adding findings that "[t]he state has a compelling interest in requiring unmarried biological fathers to demonstrate [a full commitment to the responsibilities of parenthood] by providing appropriate medical care and financial support and by establishing legal paternity, in accordance with the requirements of this chapter" as well as a compelling interest "in holding parents accountable for meeting the needs of children." Utah Code Ann. § 78–30–4.12(2)(a), (e) (Supp.2006). We are not bound in our constitutional analysis by the Legislature's statements in support of the constitutionality of the laws that the Legislature has enacted.

¶ 35 Yet we are persuaded that as interpreted by the district court in this case, the statute's effect of cutting off postbirth weekend and holiday filing opportunities for unwed fathers is not necessary to achieve the state's compelling interests, nor is such an interpretation a narrowly tailored means of achieving those interests. Under the adoption statutes as interpreted by the district court, the unwed father whose child is born on a weekend or holiday would have no opportunity to assert his paternity after the birth of the child. Accordingly, no unwed father could be certain of when he must file a paternity action and register with the Department of Health in order to preserve his rights. He could not be certain that he will have time after the birth of his child to file because his child may be born on a weekend or holiday.

¶ 36 The lack of certainty presents particular problems for unwed fathers because they must not only register by filing a simple form with the state, but also file a paternity action in which they profess a willingness to take custody of the child, "set[ ] forth ... plans for care of the child," and pay for birth expenses, all before the mother signs her consent and relinquishment.[45] On one hand, because an unwed father could not be assured of even a minimal amount of time to file after the child's birth under the district court's interpretation of the statute, there would be an incentive for the unwed father to commence an action and file early to preserve his rights. But on the other hand, the Legislature may have intended under the adoption statutes for the unwed father to reach a certain maturity in the decision-making process regarding the care of the child after birth before filing a paternity action. Therefore, the unwed father also has an incentive to wait until he is ready to finally decide what is best for the child before taking the actions required by the adoption statutes.

¶ 37 This is not a problem that we previously contemplated in *Wells* because in that case we were not presented with a situation where the father's rights were effectively cut off as of the time of the child's birth, leaving the father no postbirth opportunity to assert his rights. Wells was aware of his baby's birth that same day and presumably could have filed before the mother relinquished the baby the next day. In this case, although Thurnwald had the right—and opportunity—to assert his paternal rights prior to the birth of the child, the district court's interpretation of the statute has the effect of eliminating Thurnwald's postbirth opportunity altogether, essentially *requiring* him to have asserted his rights prebirth.

¶ 38 Neither this state nor any other state that we know of has held it constitutionally permissible to cut off a father's right to assert his paternity interest at a time before the child's birth.[46] When the court of appeals was presented with a similar problem under the old section 78-30-4 in *In re K.B.E.*,[47] it held the statute unconstitutional as applied, stating that the statute was " 'not created to encourage a "race" for placement to cut off the rights of fathers who are identified and present.' "[48] In that case, the unwed father registered on the afternoon of the same day of his child's birth, but his registration was preempted by the actions of the mother who filed an adoption petition that morning.[49] The court explained that "[t]o deprive both [the unwed father] and [the child] of the possible benefits of their relationship simply because [the unwed fa-

---

45. Utah Code Ann. § 78-30-4.14(6) (Supp.2006); *accord id.* § 78-30-4.14(2)(b) (Supp.2004).

46. The parties do not cite any such case from other jurisdictions and our own research has not uncovered any such case. In a recent case from Arkansas where a statute would have cut off a father's right to notice when he failed to file prior to his child's birth, the court found that the father's due process rights were not violated, but it rested its conclusion on the fact that the father had actual notice, which allowed him to participate in the proceeding, and thus was not prevented from asserting a paternity claim. *See Escobedo v. Nickita*, 365 Ark. 548, —— S.W.3d ——, ——, 2006 WL 563600, *1 (2006) 2006 Ark. LEXIS 178 *1.

47. 740 P.2d 292 (Utah Ct.App.1987).

48. *Id.* at 296 (quoting *Sanchez v. L.D.S. Social Servs.*, 680 P.2d 753, 756 (Utah 1984) (Durham, J., dissenting)).

49. *Id.* at 293.

ther] filed his notice just a few hours after [the mother] filed [her] petition for adoption . . . [flies] in the face of fundamental fairness and due process."[50]

¶ 39 In short, the lack of a guaranteed filing period after the child's birth under the district court's interpretation of the adoption statutes would create great uncertainty for unwed fathers and a risk of a sudden and unintentional loss of the opportunity to file that is unnecessary to the state's compelling interests. The statute already explicitly provides that the Legislature's concern for the mother's relationship with the child is important enough to require her to wait twenty-four hours before the relinquishment. In most instances when the mother relinquishes the child after the twenty-four-hour waiting period expires, the parties to the adoption will not know for certain if the father has filed an adequate legal claim until they consult the state registry. In the meantime, the child usually goes home with a prospective adoptive family. Further, in cases involving a relinquishment on a holiday or weekend, the parties to an adoption already have to wait until the next business day to be certain that the father did not file an appropriate paternity petition and register his claim. In this case, L.D.S. Family Services contacted the registry the Tuesday after Labor Day weekend. Given these practical realities, the addition of a single business day in which the father may file does not unduly burden the state's compelling interest in prompt resolution of parental rights.

¶ 40 Additionally, the uncertain filing period that the statute would provide to unwed fathers under the district court's interpretation actually works against, rather than promotes, the state's compelling interest in permanent adoptions. If the rights of unwed fathers are well defined, it will be more difficult for fathers to mount as-applied constitutional challenges to the deprivation of

their rights. As we said in *Sanchez v. L.D.S. Social Services*,[51] "a firm cutoff date is reasonable, if not essential."[52] That firm cutoff date benefits all parties if it is tied to a certain time period after the child's birth rather than being left to the uncertainty of nature. In at least one case involving an as-applied challenge to the statute, we have expressed significant concern over an unwed father's unexpected loss of the opportunity to assert paternity where the child was born prematurely.[53] Such cases would be less troubling under an interpretation of Utah law that allows unwed fathers a guaranteed window after the child's birth to assert paternity without risk that the mother's actions will deprive him of that right.

## II. RULE 6 APPLIES TO ENLARGE THE TIME THAT AN UNWED FATHER OF A CHILD BORN ON A WEEKEND OR HOLIDAY HAS TO FILE AND REGISTER

¶ 41 Having determined that the district court's interpretation of the statutes unconstitutionally deprives unwed fathers of due process, we now consider whether that unconstitutionality may be avoided by applying rule 6 of the Utah Rules of Civil Procedure to enlarge the time in which an unwed father may file when the twenty-four-hour postbirth period falls on a weekend or holiday. As the Utah Court of Appeals has recognized, because the statutes controlling adoption do not "purport to contain[ ] a complete set of procedural guidelines to govern adoptions,"[54] the rules of civil procedure are generally applicable to adoption proceedings.[55] Therefore, we will apply rule 6 to the relevant adoption statutes unless we conclude that its application would be inconsistent with those statutes.[56]

¶ 42 In determining whether application of rule 6 would be inconsistent with the adoption statutes defining the filing dead-

---

**50.** *Id.* at 296.

**51.** 680 P.2d 753 (Utah 1984).

**52.** *Id.* at 755.

**53.** *See In re Adoption of Baby Boy Doe,* 717 P.2d 686, 690–91 (Utah 1986).

**54.** *Thiele v. Anderson,* 1999 UT App 56, ¶ 15, 975 P.2d 481.

**55.** *See id.* ¶¶ 15–16 & n. 6.

**56.** *See id.* ¶¶ 16–17 & n. 6.

lines imposed on unwed fathers, we apply standard canons of statutory construction. "[O]ur primary goal is to give effect to the legislature's intent in light of the purpose the statut[es were] meant to achieve." [57] Additionally, because "no act should be declared unconstitutional unless it is clearly and palpably so," we read the statutes in a manner "consistent with basic constitutional rights." [58] Therefore, we follow the fundamental rule of statutory construction that "if a legislative act is susceptible of two constructions, one conformable to the constitutional provision on the subject and the other not, [we] will adopt the one that is conformable, and reject the one that is not." [59]

¶ 43 We initially agree with A.E. that the adoption statutes requiring unwed fathers to file a paternity petition, register, and take other actions "prior to the mother's . . . execution of consent to adoption of the child[,] or . . . relinquishment of the child for adoption" [60] are generally intended to cut off the unwed father's right to intervene at the same time that the mother's rights to the child are cut off. But as we noted above, the adoption statutes work in concert to give most unwed fathers twenty-four hours, covering a total of one business day after the birth of a child, to file a paternity petition and register—or risk losing all rights to his child. If we determine that the Legislature intended through this statutory scheme to create a minimum filing period for unwed fathers that is connected to a calculable time period after the child's birth, rule 6 of the Utah Rules of Civil Procedure would apply to enlarge the filing period when the last day falls on a holiday or weekend. And unwed fathers would essentially be given a minimum period of one business day to file a petition for paternity and to register with the state after the child's

birth—but beyond that point the unwed father could file only prior to the mother's consent or relinquishment. [61]

¶ 44 The question before us is, therefore, whether as a matter of statutory construction we should interpret the minimum filing period ending a total of one day after birth to be a time period allowed by statute subject to enlargement by rule 6, or whether the filing period must in all cases be attached to the mother's relinquishment. A.E. argues that the Legislature intended that unwed fathers demonstrate the appropriate commitment prior to the mother's relinquishment, whenever it occurs, and that the twenty-four-hour waiting period was enacted solely for the benefit of the mother. She cites for support to a treatise on family law, which suggests that such waiting periods derive

> from the view that a woman cannot fully comprehend the significance of relinquishing all rights to her child until she has had the actual experience of giving birth. She needs time to reflect upon the wisdom of an earlier expressed intention to relinquish the child, or to reconsider an earlier reluctance to relinquish. [62]

¶ 45 That the Legislature likely intended section 78–30–4.19 to give the mother sufficient time to consider her decision in light of the events of childbirth does not, however, rule out the probability that the Legislature was also concerned with defining the unwed father's rights. And as we described in the previous section, under the Utah Constitution, an unwed father must also be given a reasonable opportunity to decide whether he will take the legal actions necessary to assert his paternal rights. Section 78–30–4.19 is part of a section of the Code that establishes procedures that strike a balance between

57. *Evans v. State*, 963 P.2d 177, 184 (Utah 1998).

58. *Ellis v. Soc. Servs. Dep't of the Church of Jesus Christ of Latter-Day Saints*, 615 P.2d 1250, 1255–56 (Utah 1980).

59. *Pleasant Grove City v. Holman*, 59 Utah 242, 202 P. 1096, 1098 (1921).

60. Utah Code Ann. § 78–30–4.13(3)(d)(ii) (Supp. 2006); *accord id.* § 78–30–4.13(3)(a) (Supp. 2004), *amended by* ch. 137, § 6 & ch. 150, § 5, 2005 Utah Laws 894–96, 1017–18.

61. In Indiana, a statutory scheme that differentiates between minimum and maximum time periods controls an unwed father's filing rights, where the unwed father must register by the later of thirty days after the child's birth or the filing of a petition for the child's adoption. Ind. Code Ann. § 31–19–5–12 (LexisNexis 2006).

62. Joan H. Hollinger, *Adoption Law & Practice* § 2.11[1][a] (2006).

"the rights and interests of all parties affected by an adoption proceeding." [63] In fact, the Legislature states in section 78–30–4.12(3)(a) that "[i]n enacting Sections 78–30–4.12 through 78–30–4.21, the Legislature prescribes the conditions for determining whether an unmarried biological father's action is sufficiently prompt and substantial to require constitutional protection." [64] Thus, the statutes are subject to two possible interpretations: one where the statutes are intended to set a minimum filing period for unwed fathers and where that period is subject to enlargement by rule 6; and one where the filing period is linked only to the mother's relinquishment, whenever it occurs.

¶ 46 Where two interpretations of a statute are possible, we adopt the interpretation that is constitutional. Therefore, in this case, we interpret the adoption statutes to provide unwed fathers with a minimum filing period that in most cases extends until a total of twenty-four hours after the child's birth. In the ordinary case, this gives the unwed father a total of one full business day after his child's birth to complete the requirements (although the business day may be split, for example, between Monday afternoon and Tuesday morning). This is a period of time that can be calculated before the end of the period and thus is one to which rule 6 of the Utah Rules of Civil Procedure applies. To assure that the unwed father always gets one business day after the child's birth, we apply rule 6 any time the occurrence of a weekend or holiday means that the father is not afforded a full business day. In those cases, the filing period is extended to the end of the next business day.[65] In this case, because A.E. gave birth on Saturday morning, Thurn-

wald had until the end of the day on Tuesday to file.

## CONCLUSION

■ ¶ 47 We hold that unwed fathers have a constitutional right to a postbirth opportunity to assert paternity that is unduly infringed upon if Utah's adoption statutes are interpreted to eliminate that opportunity when a child is born on a weekend or holiday. Accordingly, we interpret Utah's adoption statutes to provide unwed fathers with a minimum period of twenty-four hours after the child's birth to file a paternity claim. And in instances where unwed fathers do not receive a full business day after the birth to file their claims because part or all of the period falls on a holiday or weekend, we apply rule 6 of the Utah Rules of Civil Procedure to enlarge the filing period to the end of the next business day. Because Thurnwald's child was born on Saturday of Labor Day weekend and he filed his paternity petition and notice on Tuesday, the next business day, we hold that Thurnwald's petition was timely. We therefore reverse the district court's grant of summary judgment against him and remand for further proceedings consistent herewith.

¶ 48 Justice PARRISH, Justice NEHRING, and Judge BARRETT concur in Justice DURRANT's opinion.

¶ 49 Having disqualified herself, Chief Justice DURHAM does not participate herein; District Judge WILLIAM A. BARRETT sat.

---

63. Utah Code Ann. § 78–30–4.12(1) (Supp.2006).

64. *Id.* § 78–30–4.12(3)(a).

65. We recognize that the application of rule 6 to the postbirth filing period may give some unwed fathers more than twenty-four hours after a child's birth to file a paternity petition. If the twenty-four-hour postbirth period falls exclusively on weekdays, the unwed father has one full business day in which to file his petition. But if any portion of the postbirth period falls on a weekend or holiday, the unwed father has until the end of the next business day to file his peti-

tion, which may result in a postbirth filing period of more than twenty-four hours even exclusive of the weekend or holiday hours. For example, if the child is born at noon on Friday, the unwed father will have until the end of the business day on Monday to file his petition. This result is a consequence of rule 6 allowing for a time period to run "until the end of the next day that is not a Saturday, a Sunday, or a legal holiday." Utah R. Civ. P. 6. When rule 6 has no application because no portion of the relevant time period falls on a weekend or holiday, there is no basis for enlarging the time for filing.

WILKINS, Associate Chief Justice, dissenting:

¶ 50 I respectfully differ with my colleagues. It appears clear that the Legislature intended to give an unmarried biological father a strictly limited but adequate period of time within which to take the legal steps necessary to assert any claim he intends to make as a legal father. The period begins at the moment of conception and ends at the time the biological mother executes her consent to adoption. If he fails to act promptly, his claim to the child ends with the mother's. The usual biological processes result in a window of at least eight or nine months within which the unmarried biological father is at liberty to file the necessary legal action and notice. The only obstacle to successful preservation of this right is totally within the control of the father: delay.

¶ 51 The limitation placed by statute on the legally effective consent to adoption by the biological mother is not linked to, nor does it appear to be intended to limit, action by the unmarried biological father. The father has until the mother consents to the adoption of the child. The mother is prohibited from consenting to the adoption for a period of 24 hours after the birth of her child. Although these two limitations are interrelated factually, they are independent legally. No direct reference to the "additional 24 hours, or one business day" relied upon by my colleagues appears in the statute relating to the father's limitations.

¶ 52 No predictable cut-off date for the father's filing is discernible in advance. It is subject to calculation only in retrospect, and only when and if the mother gives her consent to adoption of the child. As a result, Rule 6 of the Rules of Civil Procedure (extending to the next business day an act required by a designated date) has no application. An unmarried biological father cannot possibly *rely* on Rule 6 in waiting until Monday. Only after it is too late can he even know that the deadline has arrived.

¶ 53 This result, harsh as it may at times appear, is in keeping with the policy set by the Legislature. Those who elect to father a child without benefit of marriage must take steps to assert their legal relationship with the child, or they risk losing it altogether. The policy of the law is to give the greatest benefit to the child, the innocent party in the overall situation, by encouraging either responsible parenting or prompt and early adoption. A father who waits the full gestation period before taking the necessary action to ensure his continued legal relationship with his child, does so at his own risk. The law acts to cut him off, in favor of his child, when prompt and legal adoption is the alternative.

¶ 54 I find no constitutional impediment to the statutory process established by the Legislature in this regard. I would affirm the decision of the trial court.